Smith, J.
We have heretofore held, in disposing of the demurrer interposed by the defendant company to the petition of the plaintiff, that a proceeding in quo warranto, brought on behalf of the state against the corporation, might be maintained, to require it to cease to recognize as members of the board of directors, Messrs. Smith, Whittaker and Green, who, as alleged by the petition, had no right or title to such offices, and which allegations were in legal effect, admitted by the demurrer. Since this decision was rendered, the company has filed an answer setting up two separate defenses, and to these, demurrers have been filed by the plaintiff, and the question now is whether either of them is sufficient in law to bar the action of the plaintiff.
*418 On these issues thus raised, we have heard able and elaborate arguments from the counsel for the respective parties, and very many authorities beaiing upon them, have been cited to us. We have given careful consideration to these, and now state, as briefly as may be, the conclusions we have reached, (though not without difficulty), and will not attempt to refer to the many authorities to which our attention has been called. »
The first defense alleges substantially, that prior to October 6, 1891, the holders of the majority of the capital stock of the defendant company, surrendered their respective certificates of shares therein to Messrs. Brown, Shipley & Co. of London, England, under an agreement in writing, set out in the answer as Exhibit “ A/5 and respectively received from such firm certificates for a corresponding number of shares, in the form given in Exhibit “ B" set out in the answer.
That prior to the annual meeting of said company for the election of directors in October, 1891, Brown, Shipley & Co. duly surrendered to the company all of the certificates of stock so received by them, and were themselves duly registered upon the defendant’s books as the apparent owners of said stock, and that this registry continued unchanged until November 19, 1891, the date of said annual election, and thereafter Brown, Shipley & Co. have never held any stock or bonds in defendant company, other than the stock acquired as aforesaid. That the committee referred to in Exhibit “ A,” is composed of five persons, two of whom were not and are not now shareholders in the company, and by this agreement such committee was authorized to cast the vote of the shares so registered in the name of Brown, Shipley & Co., said firm having no interest in any of said stock, and having no right to vote the same, except .upon direction of the said committee, acting by a majority of a quorum of its members, three constituting a quorum.
That at the said annual election of 1881, certain persons appeared, claiming to hold the proxy of Brown, Shipley & Co., *419 to vote the shares registered in their name, and presented a paper purporting to give them such power, and bearing a signature which purported to be that of Brown, Shipley & Co., and said persons tendered the vote of said shares, which was objected to by certain shareholders, duly registered and entitled to vote at such election; but the objection was overruled by the inspectors of the election, and said votes received and counted by them in favor of said Walsh, McKim and Fahnestock, and that no other vote was cast for said persons save one, and said vote of Brown, Shipley & Co. was so cast by one of said committee.
That Smith, Whittaker and Green then were, and still are stockholders in the defendant company, and entitled to hold the office of director therein, and at said election each of them received a large majority of all the votes cast, other than the votes of Brown, Shipley & Co., and defendant’s officers and directors being advised of the nature of the voting trust imposed upon Shipley & Co., took the advice of counsel, and being advised that said trust was wholly illegal and void, and having confidence in the opinion so given to them, declined to recognize the title of the said McKim, Walsh and Fahnestock to the office of director, and recognized the title of Messrs. Smith, Whittaker and Green, who were duly elected if the vote cast in the name of Brown, Shipley & Co. was illegal.
The agreement and form of certificates set out in the answer as Exhibits “A” and “ B” are as follows:
EXHIBIT “A.”
Form ok Deposit of Common Shares.
No.........

Messrs. Brown, Shipley & Co.

Founders’ Court, Lothbury, London, E. C.
Depositary for the Committee of the Shareholders of The Ohio and Mississippi Railway Company.

*420
Shareholders’ Committee.

Sir James J. Allport.
Mr. John Morris, Captain Francis Pavy,
Mr. Joseph Price, Mr. W. H. Beeman.
The holder of the under mentioned shares hereby deposits the same with the above mentioned committee, to be exchanged for certificates to bearer, issued by Messrs. Brown, Shipley & Co., on behalf of the committee and for the purposes and subject to the conditions endorsed on such certificates, and also endorsed hereon.
The holder of the shares to sign hereon, leaving the same for deposit.
(Name in full........................ (Signature............................ (Address.............................. (Date...................................
The certificates must be listed in numerical order, and lodged with Messrs. Brown, Shipley & Co., on behalf of the Committee on ány day (except Saturdays), between 10 and 3 o’clock.

JY B. — The power of attorney at the back of the share certificates must be duly executed in favor of Brown, Shipley & Co. of London.
*421 Endorsement on Exhibit. “ A —Conditions and purposes .of deposit as endorsed upon one certificate issued on behalf of the committee.
“1. This deposit is made for the purpose of authorizing the committee named upon the face hereof to arrange certain . differences now existing between the preferred and common share holders in reference to the cumulative rights of the preferred shareholders to certain dividends, and to re-adjust the affairs of the company generally, in such manner as may seem to them best in the interests of the shareholders of the company.
“ 2. By the deposit of the shares with Messrs. Brown, Shipley & Company, of London, or with Messrs. Brown Bros. & Co., of New York, they or their assigns, (herein after called the depositary), or the committee, are invested with the same powers in all respects as to voting and otherwise, as if the committee or the depositary were the absolute owners and ■ holders thereof; but no vote in respect of such shares shall be cast by the> depositary, at any meeting of tire shareholders, except in accordance with the previous instructions of the committee.
“ 3. The genuineness of the shares deposited in respect of which this certificate is issued, cannot be guaranteed, and the committee reserve to themselves the right to call in this certificate upon returning to the holder thereof the shares so deposited by him in case the genuineness of such shares is disputed or doubtful.
“ 4. All proceedings of the committee, three of whom shall be a quorum, shall in case of difference be decided by a majority of the votes of the members of the committee present at ¡the meeting.
“ 5. In case of any vacancy occurring in the committee, the remaining members are authorized from time to time to fill up such vacancy, and ithe person or persons so selected shall *422 have the same powers as if he or they had been original members of the committee. Any member of the committee absent, abroad or through illness may, with the consent of the other members of the committee, appoint a substitute who shall represent him, and be able to exercise all his functions as a member of the committee during such absence.
“ 6. No scheme or arrangement or re-adjustment agreed upon by the committee is to beeome binding until sanctioned by a vote of a majority of each class of certificate holders present at a meeting of such class called by the committee for the purpose of considering the same, but when so sanctioned, the committee shall be irrevocably empowered to carry out the same, when and in the manner they think best,.and all the certificate holders of each class shall be definitely bound thereby.
l<7. Meetings of the certificate holders shall be convened and held upon such notice and at such time and place and generally in such manner and subject to such'regulations as to voting (either in person or by'proxy) and otherwise as shall seem best to the committee.
“8. Each member of the committee is responsible only for the bona fide exercise of his judgment on the matters dealt with by the committee.
“ 9. The depositary and the committee will recognize the bearer'of this certificate as the absolute owner of the shares thereon specified, and in case of the declaration and payment of any dividend upon such shares, the same shall be paid to the bearer of this certificate, and his receipt therefor shall be a full discharge of the payers thereof, notwithstanding any notice that they may have of the right, title, interest or claim of any person to or in such shares or moneys. The committee shall give notice of their intention to distribute any such dividend by advertisement to be inserted twice in the Times and at least one other London daily paper.
“ 10. A charge upon these shares at the rate of 6c? per share is to be paid to the depositary on deposit of the shares to the order of the said committee for the purpose of defray *423 ing the expenses of such depositary, and of said committee, and must be paid by the holder of this certificate at the time of making such deposit.”
EXHIBIT “ B.”
No. of Certificate, 18544. 10 Shares.
The Ohio & Mississippi Railway Company.

Messrs. Brown, Shipley & Co.

Certificate for the deposit of the shares of the common stock of the Ohio & Mississippi Railway Company, deposited under the conditions endorsed herein.

Committee.

Sir James J. Allport,
Mr. John Morris, Captain Francis Pavy,
Mr. Joseph Price, Mr. W. H. Beeman.
Certificate for the Shares of 100 Dollars Each.
Messrs Brown, Shipley & Co. hereby certify that they have received one certificate for ten shares of the common stock of The Ohio & Mississippi Railway Company, of 100 dollars each, which certificate is deposited subject to the conditions endorsed hereon to which the holder hereof assents and is bound by the provisions thereof. The interest represented herein is transferable on the delivery of this certificate subject to the terms and conditions endorsed thereon, and the bearer of this certificate is entitled to all rights arising from the deposit of such shares. The deposited securities have been carefully examined, but no responsibility for genuineness is undertaken by the issue of this certificate.
Dated,-, 189 — .
For the Committee.

Brown, Shipley & Co.

(Conditions and purposes of deposit endorsed on Exhibit “ B ” are identical with those endorsed on Exhibit “ A.”)
*424 By the agreement so made and carried into effect, we understand that Brown, Shipley & Co. became trustees for the . several persons so depositing with them the original shares of stock, or of those to whom the certificates issued in lieu thereof, should be assigned, — Brown, Shipley & Co. thus becoming the holders of the legal title to the stock transferred to them on the books of the company, and like other registered shareholders entitled to vote the same personally or by proxy, unless the contract itself or the scheme of it was illegal, or the mode in which it was to be executed was contrary to law, or public policy. Was this the case?
So far as we can see, there is nothing on the face of the agreement tending to show any unlawful purpose or intent on the part of those uniting in it, or to accomplish an object which would be against public policy. In the first place, it would seem that every owner of a share of stock in the company, whether common or preferred, was at liberty to become a party to the agreement, and it was not in the nature of a combination by a part of the shareholders to secure special privileges or advantages for themselves, to the prejudice of others, but it was designed apparently for the mutual benefitof all. The object, as stated therein, was to authorize the committee named, “ to arrange certain differences now existing between the preferred and common shareholders, in reference, to the cumulative rights of the preferred stockholders to certain dividends, and to re-adjust the affairs of the company generally in such manner as may seem to them best, in the in- ' terest of the shareholders of the company : ” That is, the rights and interest of all, whether signers of the agreement or not, were to be regarded, and no scheme of arrangement or re-adjustment agreed upon by the committee, was to become binding, until sanctioned by a vote of a majority of each class of certificate holders.
We understand, however, that the principal objection urged is, as to the manner provided for carrying it out, in this, viz : that the shareholders entering into the arrangement, in effect *425 absolutely and forever gave up tó tbe trustees and the committee named, part of whom were not the owners- of any stock in the company and had no interest therein, and to those whom they should bring into the committee as provided by the agreement, the right to vote the stock of the signers of the agreement so placed in the hands of the trustees ; and that this is in violation of the principle and policy of the law which not only gives each shareholder the right to cast a vote for each share held by him, but forbids the separation of this right from the ownership of the stock itself.
IV e think it is clear that such is the policy of the law, — that the election of a board of directors by which the affairs of a corporation shall be managed, or the decision of any question which shareholders are entitled to decide, should be by those who are the owners of the stock and thus immediataly interested in the management of its business, and whose action, presumably, would be in the interest of the corporation itself, and not of other persons or corporations. And therefore it is, tl\at when it appears that a contract has been made by a majority of the stockholders of a corporation, (or it may be by less than a majority,) with other persons, -whereby the simple voting power of the owners of the stock is turned over to another person or corporation, absolutely, all other rights being retained by the owner, or where it is attempted to transfer the stock to a person or corporation not allowed by law to hold the same, as in the case of parallel [competing lines of railroad in our state, courts will hold such agreement invalid.
But it seems clear, that no legal objection exists to the casting of the vote of a shareholder, or of any number of them, by persons duly authorized by the owners to do so. In such case the relation of principal and agent exists, and when the vote is so cast by the person holding the proxy, it is the vote of the owner of the stock. The voting power and the ownership of the stock are not thus improperly separated, but the legality, of it is recognized by our statutes. Nor does it alter the case if a large majority of the stockholders unite, and by *426 signing the same instrument, constitute the same person as their agent to vote for them, and further agree that the vote thus to be given, shall be for particular persons, and with the view of bringing about a particular result, not against public policy or the provisions of the statutes. Nor so far as we can see, would such agreement or authority be illegal if it should further provide that the proxy so named should cast guch votes only as he should be directed to do, by one or more other persons named or pointed out. The theory of the law, of course is, that the person casting the vote, represents the views and wishes of his principal, and the mode by which those wishes are to be ascertained and expressed, is a matter of which the corporation or the other stockholders have no right to complain. Nor in our judgment would it make any difference as to the legal effect of the instrument or arrangement, that the person or persons appointed to cast the vote, or those who are to direct how such vote is to be cast, are not themselves stockholders in the corporation. The statutes do not require the proxy to fee a shareholder.’ The material questions in this respect are, has the principal himself the right to vote, and has he properly authorized, another to do, so for him ?
Does the vote of this stock so transferred to Brown, Shipley & Co., and then duly registered in their name, and voted by them through a proxy, so differ in any material respect from the ordinary rightful vote by a proxy, as to make it illegal and invalid ?
As has been said, in pursuance of this agreement, the shares of stock deposited with Brown, Shipley & Co. were transferred to them on the books of the defendant company. This was one of the terms of the contract, or, at'least, it may be inferred therefrom, that such was the intention of the parties, as it stipulates that “ the power of attorney on the back of the share of certificates must be duly executed in favor of Brown, Shipley & Co., of London,” and the stock was to be voted by them, and there is no allegation that such was not the inten *427 tion of the parties. Having been so registered in their name, Brown, Shipley & Co., (like other registered stockholders), were entitled to vote it personally, or by proxy, as was done.
It is urged, however, that by this agreement and transaction, the stockholders signing it have forever deprived themselves of all right to vote upon this stock, of which they are the equitable owners, and that this is illegal. We do not see that such is the case. A stockholder surely has the right to transfer his stock to another, as trustee for himself or for some other person, and it is difficult to see what legal objection there is to his agreeing and binding himself that this trust should continue indefinitely, and that during its continuance, such trustee should have the legal title thereto, and the right to vote upon it. But there is no express provision in this agreement that it is to continue forever, and we incline to the opinion that a fair interpretation of it would be, that it is revocable at the pleasure of the beneficial owners, any one of whom might, when he pleased, put an end to it, so far as he is concerned. But if this be not so, and the contract by its terms is not revocable, and is on this account illegal, we would hold on the authority of Griffith v. Jewitt, (15 Law Bulletin, 419), that any subscriber thereto, might, for this reason, revoke it, and that the residue of this contract, as in the case cited, being valid, and separable from the invalid part, would stand.
We are of the opinion, then, that the demurrer to this defense should be sustained.
Second — The second defense is as follows :
“This defendant, for a second defense to the action, says: That it here repeats all the allegations of the first defense, and, in addition thereto, alleges as follows :
“That a large part of its stock was and is held in England, and that the said English shareholders formed the said committee, and created the said voting trust in Brown, Shipley <& Co., and that, while the shareholders who entered into the said agreement, supposed that its objects were only those set forth in the statement of ' conditions and purposes of de *428 posit,” hereto annexed as Exhibit ‘A’, a secret negotiation was opened between the said committee, or certain members thereof, and a representative of the Baltimore & Ohio-Railroad Company, a corporation organized under the laws of Maryland, and owning and operating a line of railroad leading from Parkersburg, West Virginia, eastward, and controlling the Baltimore & Ohio Southwestern Railroad, a railroad leading from Parkersburg, West Virginia, to Cincinnati, Ohio, which said representative was also a director of this defendant, which negotiations resulted in an agreement between the said committtee and the Baltimore & Ohio "Railroad Company acting by its said representative, whereby the entire capital stock of this defendant was to be delivered to a company to be called a “ Control Company,” in the said agreement, which said control company was to become the owner thereof, and was to issue its own certificates' in lieu thereof, and was to issue to the said Baltimore & Ohio Railroad Company $6,000,-000 of stock of said Control Company, which said stock was to enjoy the power of voting at elections of said Control Company, to the exclusion of all other stock of said company, thus conferring upon the said Baltimore & Ohio Railroad Company the absolute control of the defendant company. Upon the completion of said negotiations between the said committee and said individual director of this defendant, acting, as above-stated, for the Baltimore & Ohio Railroad Company, said English stockholders were called together in meeting in London, and assented thereto, their said assent being procured by misrepresentations then and there made to them in reference to the physical condition of the defendant's road, and the financial condition of the defendant company. It was a part of the said agreement that the said Baltimore & Ohio Railroad Company should have immediate control of the said Ohio & Mississippi Railroad Company, and the said committee, on October 14, 1891, issued its order to the president of this defendant to the effect that the defendant's road should from said date be operated as a part of the system of railroad owned or operated by *429 the Baltimore & Ohio Railroad Company. It was also a part of the agreement between the said committee and the said representative of the Baltimore & Ohio Railroad Company that at the said election of October, 1891, three persons to be designated by the said The Baltimore & Ohio Railroad Company, should be elected by the vote of said committee as members of the board of directors of the defendant; and the said Baltimore & Ohio Company, by its said representatives, designated said McKim, Walsh and Fahnestock as persons to be so elected at said election, and said vote was tendered in pursuance of the said agreement.
“This defendant states that it was advised by counsel that said agreement was in all its parts illegal and void, and that it was its duty to disregard the orders and actions of said committee, and this defendant was further advised that said voting trust was wholly illegal, and that it would be its duty to disregard any vote cast by it, and acting upon said advice, it refused to admit the said McKim, Walsh and Fahnestock to membership in its board, and recognized and admitted the three candidates who received all of the votes, cast at said meeting of November 19, 1891, except those cast for said McKim, Walsh and Fahnestook, to-wit: James H. Smith, Edwards Whittaker and Edward H. R. Green.
“ And this defendant now alleges that said voting trust was and is illegal and void, and that the attempt of the said committee to elect the said McKim, Walsh and Fahnestock, was part of a scheme to turn the control of defendant’s property over to the Baltimore & Ohio Railroad Company, in defiance of the laws of this state, and in violation of the rights and interests of the stockholders of this defendant.”
Do these allegations of fact make a good defense to the action? We think they do not. It wpuld seem that if the agreement set out in the first defense be legal and valid, that the votes cast by Brown, Shipley & Co., and the consequent election of the three directors, .McKim, Walsh and Fahnestock, should not be ignored by the defendant company, and such *430 persons so elected, be excluded from the offices to which they were elected, and persons without any legal right thereto, be acknowledged by the company as directors, on the sole ground that a director of such company, who was also a representative of the B. & O. Railroad Company, (a connecting line of road), and the committee in the first defense mentioned, had entered into an agreement like that set out in the second defense, even if the object proposed by such parties, or the manner in which it was to be accomplished, were not warranted by law.
Iiarmon, Colston, Goldsmith cfe Hoadly and Paxton & Warrington, for relator.
Ramsey, Maxwell & Ramsey and Edward Barton, for defendants.
There were other appropriate and legal means by which the carrying out of an illegal agreement might be prevented, without disfranchising the owners of a large majority of the capital stock of the company.
But we are of the opinion that, under the exceedingly broad provisions of sec. 3300 Rev. Stat. the arrangement proposed to be made is not in contravention of law.
The demurrer to this defense will also be sustained.